## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

MARY ANNE McCORMICK, Individually,
and as Personal Representative of the Estate      Court File No.: _____
of CAROLYN JEAN HARTZ, deceased,

     Plaintiff,

     v.                                                **COMPLAINT**

ELAN PHARMACEUTICALS, INC., and                   Jury Demand
CARNICK LABS, a division of ELAN
PHARMACEUTICALS, INC.,

     Defendants.

---

### PLAINTIFF'S COMPLAINT AND JURY DEMAND

NOW COMES the Plaintiff, Mary Anne McCormick, Individually and as Personal

Representative of the Estate of Carolyn Jean Hartz, by and through her attorneys, and on

her causes of action, sues the Defendants, and alleges as follows:

### INTRODUCTION

Since the first estrogen pill was introduced in 1942, makers of synthetic hormones

have created a marketing and cultural phenomenon. Drug companies' claims to support

the use of hormone therapy were never backed by reliable scientific evidence, despite a

flood of drug-company promotions.

In July, 2002, federal officials abruptly stopped a trial of hormone therapy drugs

that was being conducted by the Women's Health Initiative (WHI). The WHI trial

revealed that women taking Prempro, a combination of estrogen and progestin hormones,

experienced an increased incidence of breast cancer, heart disease and stroke. Another study published later the same month showed that women taking estrogen-only pills were at greater risk to develop ovarian cancer. The *New England Journal of Medicine* concluded in February, 2003, that the "risks of breast cancer, venous thromboembolism, and stroke are too high a price to pay" for unsubstantiated benefits of hormone therapy.

Subsequent studies following the WHI trial demonstrate conclusively that evidence-based medicine took a back seat to "conventional wisdom." The *New England Journal of Medicine* wrote in October, 2003:

> The simple and intuitively appealing concept that replacing estrogen lost during menopause would be beneficial was easy for both patients and physicians to believe . . .. *As a result, many people suspend ordinary standards of evidence* concerning medical interventions . . . despite the absence of any large scale clinical trial quantifying its overall risk-benefit ratio. [Emphasis added].

The Plaintiff in this lawsuit will prove that these hormone drugs were unreasonably dangerous for any long-term use, and that the Defendants promoted synthetic hormone drug therapy without conducting appropriate long-term, clinical trials to support their claims. Had Defendants acted appropriately, thousands of women nationwide, including Plaintiff's Decedent Carolyn Jean Hartz herein, would not have been injured by these drugs.

## I.    PARTIES

1.    Plaintiff Mary Anne McCormick, is a United States citizen, residing at 221 S. Michigan Street, Elkhart, IN 46514. Plaintiff is a citizen of the State of Indiana and is

10046

the daughter and Court appointed Personal Representative of the decedent, Carolyn Jean Hartz.

2.     Elan Pharmaceuticals, Inc. is a Delaware corporation headquartered with a principal place of business at 800 Gateway Blvd., South San Francisco, California, such that it is a citizen of the State of Delaware and the State of California.  At all times relevant hereto, Elan Pharmaceuticals, Inc. was engaged in Minnesota in the business of testing, manufacturing, labeling, marketing, distributing, promoting, and selling hormone therapy drugs, including but not limited to estrogen, estradiol and/or medroxyprogesterone acetate.  Plaintiff alleges on information and belief that Elan Pharmaceuticals, Inc. does business in Florida and, at all times relevant hereto, it tested, manufactured, labeled, marketed, distributed, promoted, and sold the above-mentioned hormone therapy drugs.

3.     Carnick Labs, a division of Elan Pharmaceuticals, Inc., is a Delaware corporation headquartered with a principal place of business at 800 Gateway Blvd., South San Francisco, California, such that it is a citizen of the State of Delaware and the State of California.  At all times relevant hereto, Elan Pharmaceuticals, Inc. was engaged in Minnesota in the business of testing, manufacturing, labeling, marketing, distributing, promoting, and selling hormone therapy drugs, including but not limited to estrogen, estradiol and/or medroxyprogesterone acetate. Plaintiff alleges on information and belief that Elan Pharmaceuticals, Inc. does business in Florida and, at all times relevant hereto, it tested, manufactured, labeled, marketed, distributed, promoted, and sold the above-mentioned hormone therapy drugs.

## II.     JURISDICTION / VENUE

4.     This Court has jurisdiction over all Defendants because each has done substantial business in each state in the United States including Minnesota.  Venue is

10046

proper in this Court, at a minimum, because each defendant is a corporation maintaining sufficient minimum contacts with this judicial district to subject the corporate to personal jurisdiction here.  The Court has subject matter jurisdiction over the controversy because the damages are within jurisdictional limits.  Plaintiff is diverse in citizenship from every defendant.

## III.   FACTUAL BACKGROUND

### A.   Case Specific Facts

5.     In approximately 1985, Plaintiff's Decedent Carolyn Jean Hartz was under the routine medical care of Jan R. Reinecke, M.D. of South Bend, Indiana.

6.     In approximately 1985, Dr. Reinecke prescribed Premarin, Provera, Amen, and/or medroxyprogesterone acetate for Carolyn Jean Hartz.

7.     In approximately 1996, Plaintiff's Decedent Carolyn Jean Hartz was under the routine medical care of Ann S. Cardenas, M.D. of South Bend, Indiana.

8.     In approximately 1996, Dr. Cardenas prescribed Prempro for Carolyn Jean Hartz.

9.     During her course of treatment with Premarin, Provera, Amen, and/or medroxyprogesterone acetate, Carolyn Jean Hartz underwent routine mammograms.

10.     In or about 1998, Carolyn Jean Hartz underwent a biopsy of a growth in her breast.  The pathology of the growth revealed it was in fact breast cancer.

11.     Carolyn Jean Hartz died on April 28, 2007.

10046

12.     The Estate of Carolyn Jean Hartz was opened on December 20, 2007. Mary Anne McCormick was named Personal Representative of the Estate pursuant to Order of the Saint Joseph County Probate Court, in the State of Indiana.

13.     As a direct result of being prescribed and taking Prempro, Premarin, Provera, Amen and/or medroxyprogesterone acetate, Carolyn Jean Hartz was diagnosed with breast cancer, suffered severe conscious pain and suffering, untold physical disfigurement, embarrassment, mental anguish, loss of confidence, a shortened life, lost economic benefits as well as expenses for care, treatment and hospitalization among other damages.

**B.      The Marketing of Hormone Therapy**

14.     Menopause is the cessation of menstruation caused by declining levels of estrogen and progesterone.  It is a natural human phenomenon – a phase of the female aging process – not a disease.  Since the late 1800's, and by the turn of the 20th century, the search for an aid to alleviate menopausal symptoms was widely pursued.

15.     In 1942, Ayerst, the predecessor to Wyeth, received FDA approval for Premarin, a mix of estrogens extracted from the urine of pregnant mares.  Premarin was marketed to women and their physicians as the long sought after replacement of lost estrogen in menopausal women, and was referred to as "replacement" estrogen therapy.

16.     The FDA originally approved Premarin only to relieve menopausal symptoms, such as hot flashes and vaginal atrophy.  Wyeth, however, has long touted additional benefits for Premarin, and its subsequently marketed hormone therapy drugs, Prempro and medroxyprogesterone acetate.

10046

17.     In the 1960's, Wyeth's Premarin promotional materials used articles and books written by Dr. Robert Wilson.  Dr. Wilson, a Brooklyn, New York, gynecologist, recommended that women use Premarin for reasons far beyond those approved by the FDA.   In a 1962 article which appeared in the *Journal of the American Medical Association (JAMA)*, Dr. Wilson claimed that taking estrogen during menopause *reduced* breast and genital cancers.  In his 1966 book, *Feminine Forever* – which Wyeth's sales forces distributed to physicians throughout the country – Dr. Wilson wrote that "aside from keeping a woman sexually attractive and potent . . . estrogen preserves the strength of her bones, the glow of her skin, the gloss of her hair . . .. Estrogen makes women adaptable, even-tempered, and generally easy to live with."  In the book, Dr. Wilson again asserted that estrogen prevented cancers.

18.     Following Dr. Wilson's publications, sales of Premarin quadrupled.  Wyeth poured thousands of dollars into Dr. Wilson's research.  By the mid-1970's, more than 30 million prescriptions for Premarin were being written every year, eventually making it the fifth most frequently prescribed drug in the United States.

19.     Physicians were instructed in advertisements to prescribe Premarin to achieve "tranquilizing" effects for their female patients – as if that effect was a laudable goal: "Almost any tranquilizer might calm her down . . . but at her age, estrogen may be what she really needs."

20.     The promotional advertising downplayed the risks of hormone therapy and over promoted the benefits.  A 1970's article in *Harper's Bazaar* claimed:  "There doesn't seem to be a sexy thing estrogen can't and won't do to keep you flirtatiously

10046

6

feminine for the rest of your days . . . a real package deal that spruces up your vagina . . ..
Prevalent medical opinion is that the safety and benefits of ERT have been convincingly
demonstrated."[1]

21.    But the "safety and benefits" of Premarin were cast in serious doubt
following a 1976 study published in the *New England Journal of Medicine* evidencing a
causal relationship between estrogen and endometrial cancer.   Sales plummeted, and
physicians stopped prescribing Premarin except to those women who had hysterectomies
and thus were not at risk for endometrial cancer.

22.    A 1980 medical article suggested a solution.   Dr. Don Gambrell, a
reproductive endocrinologist, reported in the journal *Obstetrics and Gynecology* that
adding progestin to estrogen led to a *decline* in endometrial cancer.   Wyeth thus produced
and marketed progestin (i.e. synthetic progesterone or medroxyprogesterone acetate) as
an adjunct to Premarin estrogen hormone therapy to protect against the risk of
endometrial cancer.

23.    Wyeth manufacturers, sells and distributes medroxyprogesterone acetate for
use in combination with Premarin under trademarked brand names such as Provera and
Cycrin, and as generic equivalents.   And, Prempro has the added synthetic progesterone.

24.    Additional claims were made in the 1980's when Wyeth promoted hormone
therapy to help prevent bone loss, and when Wyeth claimed that hormone drugs could
prevent cardiovascular disease.   By claiming that hormone therapy drugs prevented
osteoporosis and cardiovascular disease, Wyeth was able to promote Premarin as

---

[1] "ERT" is shorthand for Estrogen Replacement Therapy (e.g. Premarin taken alone).

10046

7

recommended treatment for all women, regardless of whether they were experiencing menopause. As a result, between 1990 and 1995, Premarin become the most frequently dispensed prescription drug in the United States.

25. Premarin's huge success was bolstered by claims that indefinite, long term use of estrogen therapy was safe and efficacious. In the early 1990's promotional videotape distributed directly to consumers entitled "*What Every Woman Should Know About Estrogen,*" Wyeth represented to women that estrogen provided "long term health protection" and should be continued indefinitely, even after short-term menopausal symptoms, such as hot flashes, had subsided. When a purported consumer inquired how long Premarin should be taken, Wyeth's doctor-spokesperson responded, "anywhere from five to ten years in order to get protection from long term problems." And, with regard to breast cancer risks, Wyeth represented to women that the benefits of taking estrogen "far outweigh[ed]" the risks for women unless they faced a particularly high risk of breast cancer.

26. Prior to 1995 Wyeth introduced Prempro, "combination" hormone therapy that contained estrogen and medroxyprogesterone acetate (synthetic progestins).

27. Wyeth led physicians and consumers to believe the promotional claims it made regarding Premarin. Likewise, when Wyeth introduced Prempro to the market, physicians and consumers were again led to believe that the same attributes existed for this hormone therapy, as Wyeth had claimed about Premarin.

28. Wyeth over-promoted Prempro, just as it did Premarin. For example, Wyeth distributed a brochure that asked women to "Take a few minutes to think about

10046

8

the rest of your life," and then listed medical conditions to "think about" which neither Prempro nor Premarin had been approved by the FDA to treat, including Alzheimer's disease, vision problems, tooth loss, heart disease, and colon cancer.

29. In a magazine advertisement featuring model Lauren Hutton, Wyeth made a rash of similar claims, suggesting that its hormone therapy drugs were appropriate for treating or preventing, among other things, memory loss, colon cancer, and age-related vision loss. In the March 19, 2000, edition of *Parade Magazine*, Wyeth spokesperson Lauren Hutton (who was not identified as a Wyeth spokesperson) was asked what she did to look good and feel fit, and she answered: "[M]y number one secret is estrogen. It's good for your moods; it's good for your skin. If I had to choose between all my creams and makeup for feeling and looking good, I'd take the estrogen."

30. Wyeth's DTC (i.e. "direct-to-consumer" or "DTC" marketing) efforts have included overt advertising pieces, such as print advertisements, videotapes, and brochures directed to consumers, as well as "product placement" efforts in which hormone therapy drugs are favorably positioned in entertainment vehicles or favorably described in popular press by hired spokespersons.

31. Wyeth vigorously promoted hormone therapy to physicians, as well as to consumers directly. In 1999, Wyeth spent $34.7 million on DTC advertising for Prempro. In 2000, Wyeth spent $37.4 million on Prempro DTC advertising. The thrust of Wyeth's marketing efforts has been to create a lifelong consumer demand for hormone therapy, and a belief by physicians that the prescription is beneficial to menopausal and post-menopausal patients.

10046

C.     **The WHI and NCI Studies**

32.     Defendant's promotion of hormone therapy for long-term use proved false and misleading when studies released in July, 2002 showed that such use substantially increases the risk of *causing* disease.

33.     Two large cohort studies concluded that the risks of hormone therapy outweighed the benefits for most women: The WHI study, reported at Roussow JE, et al., *Risks and Benefits of Estrogen Plus Progestin in Health Post-menopausal Women.* (JAMA. 2002 Jul 17; 288:321-33.); and, the NCI study, reported at Lacey JV Jr., et al., *Menopausal Hormone Replacement Therapy and Risk of Ovarian Cancer.* (JAMA. 2002 Jul 17; 288(3):334-41.).

34.     The Women's Health Initiative (WHI) is a group focused on defining the risks and benefits of strategies that could potentially reduce the incidence of heart disease, breast and colorectal cancer, and fractures in post-menopausal women. Between 1993 and 1998, the WHI enrolled 161,809 post-menopausal women in the age range of 50 to 79 years into a set of clinical trials and an observational study at 40 clinical centers in the United States. Included within the clinical trials was a study by the National Heart, Lung, and Blood Institute (NHLBI) of the National Institutes of Health (NIH).

35.     Participants in the NHLBI component of the WHI trial, like most women with a uterus who take hormone therapy, were given progestin in combination with estrogen (i.e., combination hormone therapy). The estrogen plus progestin phase of the WHI trial involved 16,608 women ages 50 to 79 years with an intact uterus. An important objective of the trial was to examine the effect of estrogen plus progestin on

10046

the prevention of heart disease and hip fractures, and any associated change in risk for breast and colon cancer. The study did not immediately address the short-term risks and benefits of hormones for the treatment of menopausal symptoms.

36.    Women enrolled in the estrogen plus progestin study were randomly assigned to a daily dose of estrogen plus progestin (0.625 mg of conjugated equine estrogens plus 2.5 mg of medroxyprogesterone acetate) or to a placebo. Those participants receiving the drug (not placebo) received Wyeth's drug Prempro. Participants were enrolled in the study between 1993 and 1998 at over 40 clinical sites across the country.

37.    In 2000 and again in 2001, WHI investigators complied with a recommendation from the study's Data and Safety Monitoring Board (DSMB) to inform participants of a small increase in heart attacks, strokes, and blood clots in women taking hormones. The DSMB, an independent advisory committee charged with reviewing results and ensuring participant safety, found that the actual number of women having any one of these events was small and did not cross the statistical boundary established to ensure participant safety. Therefore, the group recommended continuing the trial due to the still uncertain balance of risks and benefits.

38.    At the DSMB's meeting on May 31, 2002, the data review revealed for the first time that the number of cases of invasive breast cancer in the estrogen plus progestin group had crossed the boundary established as a signal of on increased risk. The DSMB's May 31, 2002, recommendation to stop the trial was based on the finding of increased breast cancer risk, supported by the evidence of overall health risks exceeding

10046

11

any benefits.  On July 8, 2002, participants started receiving letters informing them about the results and telling them that they should stop study medications.

39.     The WHI study found that for the estrogen plus progestin group (i.e., those women who took Prempro) compared to placebo, overall there was a:

    (i)     41 percent increase in strokes,

    (ii)    29 percent increase in heart attacks,

    (iii)   100 percent increase in venous thromboembolism (blood clots),

    (iv)   22 percent increase in total cardiovascular disease,

    (v)    26 percent increase in breast cancer,

    (vi)   37 percent reduction in cases of colorectal cancer, and

    (vii)  one-third reduction in hip fracture rates.

40.     The WHI Study concluded that the "overall health risks exceeded benefits from use of combined estrogen plus progestin for an average 5.2 year follow-up among healthy post-menopausal US women."  The Study also found that the combination hormone regimen should not be initiated or continued for primary prevention of coronary heart disease.

41.     Because of the importance of the report from the WHI investigators on the estrogen plus progestin study, the study was released early to the public on July 9, 2002, as an expedited article to the *JAMA* Website.  In commenting on the study's findings, NHLBI Director, Dr. Claude Lenfant, was unequivocal in his own conclusions:

> The cardiovascular and cancer risks of estrogen plus progestin outweigh any benefits – and a 26 percent increase in breast cancer

risk is too high a price to pay, even if there were heart benefits. Similarly, the risks outweigh the benefits of fewer hip fractures.

42.    Dr. Jacques Roussow, acting director of the WHI and lead author of the *JAMA* article, summarized the risks of combination hormone replacement therapy in a very straightforward manner as he explained the statistical significance of the study results:

> The WHI results tell us that during one year, among 10,000 post-menopausal women with a uterus who are taking estrogen plus progestin, *eight more will have invasive breast cancer, seven more will have a heart attack, eight more will have a stroke, and 18 more will have blood clots, including eight with blood clots in the lungs*, than will a similar group of 10,000 women not taking these hormones. This is a relatively small annual increase in the risk for an individual woman. Individual women who have participated in the trial and women in the population who have been on estrogen and progestin should not be unduly alarmed. However, even small individual risks over time, and on a population-wide basis, add up to *tens of thousands of these serious adverse health events*.

(Emphasis added).

43.    Within a week after the WHI trial results were reported, another article appeared in *JAMA* related to the risk of long-term use of estrogen only therapy. On July 17, 2002, *JAMA* published a NCI study, which found that women who took estrogen were more likely to develop ovarian cancer than those not on the hormone.

44.    In the study, researchers from the NCI followed 44,241 women for 19 years who were taking only estrogen and found that these women had a 60 percent higher risk of ovarian cancer than the women who had never used estrogen. The risk increased proportionately with longer duration of estrogen use. Women who took estrogen for 10 to 19 years had an 80 percent higher risk than those who did not take the pills. Those on

10046

13

hormone therapy for 20 years or more were three times as likely to develop ovarian cancer as women who did not take it at all.  Most of the NCI participants used Wyeth's brand of estrogen therapy, Premarin.

45.     Lead author of the NCI study, Dr. James V. Lacey, summarized the results of his study with the following statement:

> The main finding of our study was that post-menopausal women who used estrogen replacement therapy for 10 or more years were at a significantly higher risk of developing ovarian cancer than women who never used hormone replacement therapy.

46.     Dr. Lacey further underscored the implications of his NCI study by explaining that the findings translate into one or two additional ovarian cancers each year per 10,000 women taking estrogen alone.  In 2000, eight million American women took Premarin, the leading estrogen therapy pill.  The Lacey study demonstrates that Premarin usage is responsible for up to 1,600 additional ovarian cancer cases in the year 2000 alone.

47.     In October 2003, the WHI study produced a report with findings similar to the NCI study regarding ovarian cancer.  The October 1, 2003, issue of *JAMA* reported that combination hormone therapy was also associated with increased risk for ovarian cancer:  the WHI investigators found that women randomized to receive combined hormone therapy (i.e. estrogen plus progestin) experienced a 58 percent increase in ovarian cancer rates.

48.     Upon information and belief, and as evidenced by the foregoing studies, Plaintiff believes that any estrogen dosage in combination with progesterone greatly increases the risk for developing breast cancer.

**D.     The Aftermath of the WHI and NCI Studies**

49.     The WHI and NCI studies received enormous media coverage: front-page newspaper headlines, magazine covers, and broadcast news programs urgently reported the alarming and significant findings.

50.     Commenting on the WHI study, Dr. Leslie Ford, associate director for clinical research at the NCI's Division of Cancer Prevention, re-emphasized the risk of hormone therapy to patients:

> The reduction in colorectal cancer risk in the WHI is intriguing, but the balance of harm versus benefit does not justify any woman beginning or continuing to take estrogen plus progestin for this purpose.

51.     Dr. Isaac Schiff of Massachusetts General Hospital also commented on the WHI study, noting, "Quality of life is very, very important . . .. From a heart and breast cancer point of view, the drug should be outlawed.  But for hot flashes, there's nothing better."

52.     The WHI and NCI study conclusions regarding the unsafe and dangerous adverse effects of hormone therapy have been verified by subsequent published research. A study on hormone therapy and breast carcinoma risk in Hispanic and Non-Hispanic women, reported on September 1, 2002, in the journal *Cancer*, found that Hispanic post-

menopausal women have significantly increased breast cancer risk after long-term hormone therapy.

53.    On October 23, 2002, the United Kingdom's Medical Research Council announced that it had ended a clinical study of the risks and benefits of long-term use of hormone therapy for "scientific and practical reasons."  Approximately 5,700 women were enrolled in the "WISDOM" study (the Women's International Study of Long Duration Oestrogen after Menopause).  The study was to include 22,000 women.  However, following the WHI study, the WISDOM study was canceled.  The Medical Research Council concluded "There is strong evidence that taking hormone therapy long term increases the risk of some diseases such as breast cancer and decreases the risks of others such as osteoporosis."

54.    Because of the significance of its findings, on March 17, 2003, the *New England Journal of Medicine* (*NEJM*) released a follow-up WHI study two months in advance of its May 8, 2003 publication date.  The follow-up study reported that hormone therapy failed to improve the quality of life for menopausal women.

55.    The "Quality of Life" study which examined the same pool of 16,000 women as the July 9, 2002, WHI study, found that hormone therapy drugs do not do the very thing many women took them for in the first place, that is, to make them feel happier and healthier after menopause.  A comparison of women who took hormone therapy to women given a placebo showed those women taking hormones did not report sleeping better or feeling better.  The hormone therapy group also did not report feeling less depressed or more sexual satisfaction than the placebo group.

56.    According to the study's lead author, Dr. Jennifer Hays: "It's just not something that's going to make most women feel better.   Even if it reduces your symptoms, that's not going to translate into a meaningful effect on a quality of life."  Dr. Deborah Grady of the University of California, in an accompany commentary in the same issue of the *NEJM*, said that:  "There is no role for hormone therapy in the treatment of women without menopausal symptoms," and that only women who were experiencing debilitating menopausal symptoms should take hormone therapy.  She stated further that those women who do continue with hormone therapy should take the lowest possible does for the shortest possible time.

57.    On May 21, 2003, *JAMA* published another study regarding the efficacy of estrogen plus progestin therapy (e.g. Prempro) for the prevention of bone loss in elderly women.  The study involved 373 women ages 65 to 90 who had either thinning bones or full-blown osteoporosis and took one of four treatments for three years:  (i) combination hormone therapy alone, (ii) a bone-building drug, alendronate (which is sold under the brand name, Fosamax), (iii) combination hormone therapy with Fosamax, or (iv) a placebo.

58.    While the study found that the combination of hormone therapy and Fosamax was effective at treatment and prevention of post-menopausal osteoporosis, it also concluded that Fosamax alone was more effective than combination hormone therapy alone.  After three years, hip bone density had increased nearly six percent in women on hormone therapy with Fosamax, four percent in those on Fosamax alone, and three percent in the hormones-only group.

10046

59.    WHI researcher Dr. Hays, the lead author of the May 8, 2003 *JAMA* study on hormone therapy and quality of life, said that the findings of the bone-loss study are not convincing enough to recommend hormone therapy for osteoporosis prevention even in older women, especially because the study showed that the bone enhancing benefits from estrogen come only after long-term use which also carries the highest risk of breast cancer or heart disease.

60.    On May 28, 2003, *JAMA* published yet another study on the effects of hormone therapy, this time focusing on the risk of Alzheimer's disease and other types of dementia.   The study found that combination hormone therapy, consisting of both estrogen and progestin, doubled the risk of dementia for woman who started hormones at age 65 or older.

61.    The dementia study was based on a four-year experiment involving 4,532 women at 39 medical centers, where half took placebos and half took Prempro.  In four years, there were 40 cases of dementia in the Prempro group and 21 in the placebo group. Translated to an annual rate for the population-at-large, the results mean that for every 10,000 women 65 and older taking hormone therapy, there will be 45 cases of dementia a year with 23 of them attributable to hormone use.

62.    Dr. Sally A. Shumaker, the director of the dementia study and a professor of public health sciences at Wake Forest University, stated that the study's "clear message is that there's no reason for older women to be taking combination hormone therapy."

63.   On June, 25, 2003, *JAMA* published still another study analyzing the data from the Women's Health Initiative, which found that combination hormone therapy, consisting of both estrogen and progestin, doubled the risk of dementia for women who started hormones at age 65 or older.

64.   The connection between hormone therapy usage and breast cancer found in the WHI studies were confirmed by a similar study conducting in the United Kingdom. The August 9, 2003, issue of *Lancet* reported on the conclusions reached by *The Million Women Study* – a major research effort funded by Cancer Research UK – confirming that current and recent use of hormone therapy increase a woman's chance of developing breast cancer, and that the risk increases with the duration of use.  Scientists at the Cancer Research UK analyzed data from over one million women between the ages of 50 and 64. Researchers found that post-menopausal women using combination hormone therapy were twice as likely to develop breast cancer as non-users (a 100% increase).

65.   In the August 7, 2003, issue of *NEJM*, the WHI study continued to yield important information regarding the safety of hormone therapy use.  The study found that combination hormone therapy does not protect the heart and may even increase the risk of coronary heart disease (CHD).  Specifically, the WHI study found that combination hormone therapy usage was associated with a 24% overall increase in the risk of CHD (6 more heart attacks annually per 10,000 women using combination therapy) and an 81% increased risk of CHD in the first year after starting combination therapy.

66.   In addition to the studies published in *JAMA, NEJM*, and other journals, a recent federal agency report also revealed that estrogen could be dangerous to women

10046

taking it as hormone therapy.   On December 11, 2002, the National Institute of Environmental Health Sciences released its tenth annual report on carcinogens, which declared for the first time that estrogen is now on the federal government's list of "known human carcinogens."

## E.   Wyeth Changes Hormone Labels and Reverses Long-Term Marketing Strategy

67.   In light of the WHI and NCI studies and other subsequent research reports, the labels provided by Wyeth for its Premarin and Prempro drugs were inadequate, misleading, and inaccurate.  In fact, Wyeth changed warning labels on Premarin and Prempro during the last week of August, 2002 to reflect the results of the July, 2002 WHI and NCI studies.

68.   Prior to the label change in August, 2002, the Premarin warning label made no mention whatsoever of ovarian cancer.

69.   The Prempro label warnings were likewise inadequate prior to August, 2002.  As to breast cancer, the Prempro warning explains the risk of breast cancer with conjugated estrogens (the Premarin component of Prempro), but then adds, with regard to the effect of added progestins on the risk of breast cancer:  "The overall incidence of breast cancer does not exceed that expected in the general population."  The WHI study plainly reveals that this warning is false and was known or should have been known by Wyeth to be false for decades.

10046

70.   The Prempro warnings were also inadequate for two thromboembolic disorders, pulmonary embolisms and blood clots:   "The increased risk [of venous thromboembolism] was found only in current ERT [i.e. Premarin only] users." Furthermore, as to cardiovascular disease (heart attacks and strokes), the Prempro warning reads simply, "Embolic cerebrovascular events and myocardial infarctions have been reported," without disclosing the true nature of the risk.

71.   Under precautions, the Prempro label acknowledges:   "The effects of estrogen replacement therapy on the risk of cardiovascular disease have not been adequately studied."   Nevertheless, Wyeth has long promoted the supposed benefits of long-term therapy for cardiovascular disease.

72.   On January 6, 2003, Wyeth abandoned its long-standing marketing strategy of promoting the long-term use of Premarin and Prempro.   Wyeth announced the reversal of its long-held promotional message in a "Dear Doctor" letter to Health Care Professionals that explained it was adopting new labeling for its hormone therapy drugs in light of the WHI findings.

73.   According to the January 6, 2003, "Dear Doctor" letter, the labeling changes included boxed warnings:

> [W]hich state that estrogens plus progestin therapies should not be used for prevention of cardiovascular disease . . ..   The boxed warning also included information [stating that because of the WHI study] . . . estrogens and estrogens plus progestin *should be prescribed for the shortest duration consistent with treatment goals*.

(Emphasis added).

10046

21

74.   In early June 2003, Wyeth commenced a new public marketing campaign with a full-page advertisement placed in 180 newspapers nationwide. The advertisement, "*A Message from Wyeth,*" disclosed that Wyeth was abandoning its decades-long strategy of promoting long-term usage of Premarin and Prempro for post-menopausal women for a variety of conditions.

> Hormone therapy is not a lifelong commitment. As a result of recent studies, we know that hormone therapy should not be used to prevent heart disease. These studies also report an increased risk of heart attack, stroke, breast cancer, blood clots, and dementia. Therefore, it is recommended that hormone therapy (estrogen, either alone or with progestin) *should be taken for the shortest duration* at the lowest effective dose.

(*The Philadelphia Inquirer*, June 1, 2003, at C6, emphasis added).

75.   Wyeth had recklessly and willfully failed to conduct adequate pre-approval research and post-approval surveillance to establish the safety of long-term hormone therapy. Nonetheless, Wyeth had promoted long-term hormone therapy use vigorously. The WHI and NCI studies could have and should have been conducted many years ago by Wyeth, before it began its long-term usage marketing campaign. Had it conducted the necessary studies and diligent post-marketing surveillance, Wyeth could have learned years ago that hormone therapy causes cardiovascular diseases, is marginally effective in preventing bone loss, does not promote well-being, causes a number of cancers and dementia, and is even harmful on a short-term basis by increasing the risk of breast cancer.

10046

## FRAUDULENT CONCEALMENT

76.    Any applicable statutes of limitations have been tolled by the knowing and active concealment and denial of the facts as alleged herein by the Defendants. Plaintiff's Decedent was kept in ignorance of vital information essential to the pursuit of these claims, without any fault or lack of diligence on their part. Plaintiff's Decedent could not reasonably have discovered the dangerous nature of, and unreasonable adverse side effects associated with Prempro prior to July 9, 2002.

77.    The Defendants were under a continuing duty to disclose to Plaintiff's Decedent the true character, quality, and nature of their hormone therapy drugs, including but not limited to Premarin, Provera, Prempro, Premphase and medroxyprogesterone acetate. Because of their concealment of the true character, quality and nature of their hormone therapy drugs, Defendants are estopped from relying on any statute of limitations defense.

## IV.    CAUSES OF ACTION

### COUNT I – NEGLIGENCE (DESIGN DEFECT)

78.    Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein at length, and further alleges:

79.    At all relevant times, Defendants had a duty to exercise reasonable care pursuant to Indiana's Product Liability Act, I.C. §34-20-1-1 *et. seq.*, and to comply with the existing standard of care, in its preparation, design, research, development, manufacture, inspection, labeling, marketing, promotion, and sales of its hormone

10046

therapy drugs, which they introduced into the stream of commerce, including a duty to ensure their hormone therapy drugs did not cause users to suffer from unreasonable, dangerous or untoward adverse side effects.

80.    At all times relevant, Defendants owed a duty to warn consumers of the risks, dangers, and adverse side effects of its hormone therapy drugs properly.

81.    Defendants breached their duty of care, and failed to exercise ordinary care in the preparation, design, research, development, manufacturing, inspection, labeling, marketing, promotion, and selling of Prempro which it introduced into the stream of commerce, because Defendants knew or should have known that its hormone therapy drugs created the risk of unreasonable, dangerous or untoward adverse side effects.

82.    Defendants knew, or in the exercise of reasonable care, should have known that Prempro was of such a nature that, if not properly prepared, designed, researched, developed, manufactured, inspected, labeled, marketed, promoted, and sold, they were likely to cause injury to those who took their drugs.

83.    Defendants breached their duty of care, and failed to use due care, in the manner in which they prepared, designed, researched, developed, manufactured, inspected, labeled, marketed, promoted, and sold their products, in that they:

> (i)    Failed to prepare their hormone therapy drugs appropriately to prevent the aforementioned risks to individuals when the drugs were ingested;

10046

(ii)   Failed to design their hormone therapy drugs appropriately to prevent the aforementioned risks to individuals when the drugs were ingested;

(iii)   Failed to conduct adequate pre-clinical testing and research to determine the safety of their hormone therapy drugs;

(iv)   Failed to conduct adequate post-marketing surveillance to determine the safety of their hormone therapy drugs;

(v)   Failed to accompany their products with proper warnings regarding all possible adverse side effects associated with the use of the hormone therapy drugs and the comparative severity and duration of such adverse effects;

(vi)   Failed to manufacture their hormone therapy drugs appropriately to prevent the aforementioned risks to individuals when the drugs were ingested;

(vii)   Failed to inspect their hormone therapy drugs appropriately to prevent the aforementioned risks to individuals when the drugs were ingested;

(viii)   Failed to label their hormone therapy drugs appropriately to prevent the aforementioned risks to individuals when the drugs were ingested;

10046

(ix)   Failed to market their hormone therapy drugs appropriately to prevent the aforementioned risks to individuals when the drugs were ingested;

(x)   Failed to promote their hormone therapy drugs appropriately to prevent the aforementioned risks to individuals when the drugs were ingested;

(xi)   Failed to provide adequate training and information to healthcare providers for the appropriate use of their hormone therapy drugs;

(xii)   Were otherwise careless and negligent.

84.   Despite the fact that Defendants knew or should have known that their hormone therapy drugs caused unreasonable and dangerous side effects, which many users would be unable to remedy by any means, they continued to promote and market their drugs to consumers, including Plaintiff's Decedent Carolyn Jean Hartz when there existed a safer and more effective method of countering the negative health effects of menopause, and of preventing osteoporosis and other disease states claimed by Wyeth to be prevented by its hormone therapy.

85.   Defendants knew or should have known that consumers generally, and Plaintiff's Decedent Carolyn Jean Hartz specifically, would foreseeably suffer injury as a result of these Defendants' failure to exercise ordinary care.

86.   Plaintiff is entitled to punitive damages because Defendants' failure to warn was reckless and without regard for public safety and welfare. Defendants misled both the medical community and the public at large, including Plaintiff, by falsely representing

10046

the safety of their products. Defendants downplayed, understated, and disregarded their knowledge of the serious and permanent side effects associated with the use of hormone therapy drugs despite available information demonstrating their products were likely to cause serious and sometimes fatal side effects to users.

87.     Defendants were or should have been in possession of evidence demonstrating that their products caused serious side effects. Nevertheless, Defendants continued to market their products by providing false and misleading information with regard to their safety and efficacy.

88.     Defendants' actions described above were performed willfully, intentionally, and with reckless disregard for the rights of Plaintiff's Decedent Carolyn Jean Hartz and the public.

89.     As a result of Defendants' conduct, Plaintiff's Decedent Carolyn Jean Hartz suffered those injuries and damages described with particularity, above.

WHEREFORE, Plaintiff, Individually and as the Personal Representative for the Estate of Carolyn Jean Hartz, prays for judgment against Defendants, jointly and severally, in an amount which will compensate the Plaintiff for her injuries, and punitive damages in an amount which will deter the Defendants and others from like conduct.

## COUNT II – NEGLIGENCE (FAILURE TO WARN)

90.     Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein at length, and further alleges:

91.     Defendants are manufacturers and/or suppliers of hormone therapy drugs, and in violation of Indiana's Product Liability Act, I.C. §34-20-1-1 *et. seq.* placed these

10046

drugs into the stream of commerce in a defective and unreasonably dangerous condition such that the foreseeable risks exceeded the benefits associated with the design and/or formulation of the product.

92. The hormone therapy drugs manufactured and/or supplied by the Defendants were not accompanied by proper warnings to physicians, the medical community and women regarding all possible adverse side effects associated with the use of their hormone therapy drugs and the comparative severity and duration of such adverse effects.

93. Defendants failed to accurately warn Plaintiff's Decedent and her healthcare providers, prior to actively encouraging and promoting the sale of their hormone therapy drugs, either directly or indirectly, orally or in writing, about the following:

(i) The need for comprehensive, regular medical monitoring to ensure early discovery of potentially fatal strokes, heart attacks, venous thromboembolism, cardiovascular disease, breast cancer, ovarian cancer, and other adverse side effects;

(ii) The possibility of becoming disabled as a result of the use of the drugs; and

(iii) The adverse side effects associated with the use of the drugs, including, but not limited to, strokes, heart attacks, venous thromboembolism, cardiovascular disease, breast cancer, and ovarian cancer.

10046

94.    Defendants failed to perform adequate testing which would have shown that their hormone therapy drugs possessed serious potential side effects with respect to which full and proper warnings, accurately and fully reflecting symptoms, scope and severity, should have been made.

95.    The hormone therapy drugs manufactured and/or supplied by Defendants were defective due to inadequate post-marketing warning or instruction because, after Defendants knew or should have known of the risk of injury and death from hormone therapy drugs, they failed to provide adequate warnings to physicians or consumers. And despite their inadequate post-marketing warnings and instructions to physicians, the medical community, and consumers, Defendants continued to promote the products aggressively.

96.    Had adequate warnings or instructions been provided, Plaintiff's Decedent Carolyn Jean Hartz would not have taken the drugs as she did, and would not have suffered harmful side effects.

97.    As the direct and proximate cause of the defective condition of hormone therapy drugs as manufactured and/or supplied by Defendants, and Defendants' failure to warn of said dangers and defects, Plaintiff's Decedent Carolyn Jean Hartz suffered those injuries and damages as described with particularity above.

WHEREFORE, Plaintiff, Individually and as the Personal Representative for the Estate of Carolyn Jean Hartz, prays for judgment against Defendants, jointly and severally, in an amount which will compensate Plaintiff for her injuries, and punitive damages in an amount which will deter the Defendants and others from like conduct.

10046

## COUNT III – CORPORATE RESPONSIBILITY: JOINT VENTURES, PARENT/SUBSIDIARIES, AND/OR SUCCESSOR CORPORATIONS

98.    Plaintiff repeats and realleges, as if fully set forth herein, each and every allegation contained in the above paragraphs and further alleges:

99.    As a result of their participation in various joint ventures, parent/subsidiary relationships, and/or successor corporations with each other relative to the manufacture, sale, and promotion of the subject drugs, Defendants are liable to Plaintiff.

100.    As a result of the invalidity of various indemnification agreements, Defendants are liable to Plaintiff.

101.    Defendants are liable to Plaintiff, as alter egos of their joint ventures, parent/subsidiary relationships, and/or successor corporations.

WHEREFORE, Plaintiff, Individually and as the Personal Representative for the Estate of Carolyn Jean Hartz, prays for judgment against Defendants, jointly and severally, in an amount which will compensate Plaintiff for her injuries, and punitive damages in an amount which will deter the Defendants and others from like conduct.

## COUNT IV- BREACH OF EXPRESS WARRANTY

102.    Plaintiff repeats and realleges, as if fully set forth herein, each and every allegation contained in the above paragraphs and further alleges:

103.    Defendants, through description, affirmation of fact and promise expressly warranted to the FDA, prescribing physicians and the general public, including Plaintiff's Decedent, that their hormone therapy products were both efficacious and safe for the intended use. These warranties came in the form of:

10046

a.   Publicly-made written and verbal assurances of the safety and efficacy of hormone therapy drugs;

b.   Publicly-made written and verbal assurances downplaying the risks associated with hormone therapy drugs;

c.   Press releases, interviews and dissemination via the media of promotional information, the sole purpose of which was to create an increased demand for hormone therapy drugs, that provided assurances of the safety and efficacy of hormone therapy drugs;

d.   Press releases, interviews and dissemination via the media of promotional information, the sole purpose of which was to create and increase demand for hormone therapy drugs, that downplayed the risks associated with hormone therapy drugs;

e.   False and misleading written information, supplied by Manufacturing Defendants, and published in the *Physicians Desk Reference* on an annual basis, upon which physicians relied in prescribing hormone therapy drugs during the period of Plaintiff's Decedent's ingestion of hormone therapy drugs, including, but not limited to information relating to the recommended dose, administration and duration of the use of the drugs;

f.   Promotional pamphlets and brochures published and distributed by Manufacturing Defendants and directed to consumers; and

g.   Advertisements.

The documents referred to in this paragraph were created by and at the direction of Defendants.

104.   At the time of these express warranties, Defendants knew of the intended uses of hormone therapy and, for these uses, warranted it to be in all aspects safe, effective and proper. Defendants' hormone therapy drugs did not conform to these express representations in that they were neither safe nor effective, and use of such drugs produced serious adverse side effects.

105.   As such, Defendants' products (a) failed to conform to the promises, descriptions or affirmations of fact made about these drugs and (b) were not adequately contained, packaged, labeled or fit for the ordinary purposes for which such goods are used.

106.   Defendants breached their express warranties to Plaintiff's Decedent by:

a.   Manufacturing, marketing, packaging, labeling and selling hormone therapy drugs to Plaintiff's Decedent and other users in such a way that misstated and/or downplayed the risks of injury, without warning or disclosing such risks by package or label to Plaintiff's Decedent and/or her prescribing physician, or without so modifying or excluding such express warranties;

10046

32

b.  Manufacturing, marketing, packaging, labeling and selling to Plaintiff's Decedent hormone therapy drugs that failed to counteract the negative health effects of menopause in a safe and permanent manner and without injury;

c.  Manufacturing, marketing, packaging, labeling and selling hormone therapy drugs to Plaintiff's Decedent in such as way as to promote long-term use at high dosage; and

d.  Manufacturing, marketing, packaging, labeling and selling hormone therapy drugs to Plaintiff's Decedent and other users, thereby causing Plaintiff's Decedent serious physical injury and pain and suffering.

107. As a direct and proximate result of Defendants' conduct, Plaintiff's DEcedent suffered injury and suffered compensatory and punitive damages in an amount to be proven at trial.

108. Defendants' actions, described above were performed willfully, intentionally, with malice and/or with reckless disregard for the rights of Plaintiff's Decedent and the public. At a minimum, Defendants' acts and omissions, when viewed objectively from the standpoint of Defendants at the time of their occurrence, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others. Defendants had actual and subjective awareness of the risk involved but nevertheless proceeded with conscious indifference to the rights, safety or welfare of

10046

others, including Plaintiff's Decedent.  As such, Plaintiff is entitled to punitive damages

against Defendants.

## COUNT V- FRAUD

109.   Plaintiff incorporates by reference all other paragraphs of this Complaint as

if fully set forth herein at length, and further alleges:

110.   Defendants, having undertaken to prepare, design, research, develop,

manufacture, inspect, label, market, promote and sell their hormone therapy drugs, owed

a duty to provide accurate and complete information regarding these products.

111.   Defendants'   advertising   program,   by   containing   affirmative

misrepresentations and omissions, falsely and deceptively sought to create the image and

impression that their hormone therapy drugs were safe for human use, had no

unacceptable side effects and would not interfere with daily life.

112.   Defendants intentionally encouraged prescribing physicians, consumers and

Plaintiff to remain on hormone therapy for a longer duration than Defendants knew or

should have known was safe and effective and at higher dosage levels than necessary.

113.   Defendants purposefully concealed, failed to disclose, misstated,

downplayed and understated the health hazards and risks associated with the use of

hormone therapy.  Defendants, through promotional practices as well as the publication

of medical literature, deceived potential users and physicians prescribing the drugs by

relaying only allegedly positive information, while concealing, misstating and

downplaying the known adverse and serious health effects.  Defendants falsely and

deceptively kept relevant information from potential hormone therapy users and

10046

34

minimized the concerns of prescribing physicians regarding the safety and efficacy of their drugs.

114. Defendants expressly denied that their hormone therapy products created an increased risk of cancer or injury and took affirmative steps to prevent the discovery and dissemination of any evidence on the increased likelihood of injury from their hormone therapy products.

115. Defendants did not properly study or accurately report the results of its human, animal and cell studies in terms of risks and benefits of its hormone therapy drugs. Defendants also fraudulently and intentionally polluted the scientific literature related to hormone therapy in general and their hormone drugs in particular. Defendants hired physicians and scientists to write inaccurate and misleading scientific articles for the purpose of contaminating scientific and medical knowledge pertaining to hormone therapy and Defendants' particular products. Defendants then used and relied on these inaccurate and fraudulently prepared scientific papers to defend and justify the marketing, promotion and labeling of their hormone products. At all relevant times, Defendants knew these publications were inaccurate and would mislead those in the medical and scientific communities who were studying or prescribing the hormone drugs.

116. Defendants effectively deceived and misled the scientific and medical communities regarding the risks and benefits of hormone therapy products. The truth did not begin to emerge until publication of the WHI study results. Even this publication, however, was inadequate, at least in the short-term, to overcome the effects of the misinformation Defendants have consistently and continually provided.

10046

117. The misconceptions as to the true risks and benefits of Defendants' hormone drugs were pervasive throughout the medical and scientific communities due to Defendants' marketing methods. These methods included, but were not limited, to the following:

    a.    Publishing papers in the scientific and medical literature that contained statements Defendants knew to be false;

    b.    Knowingly providing false and misleading information to doctors during sales and detailing calls at the doctors' offices or at medical or scientific conferences and meetings;

    c.    Funding third-party organizations to disseminate false and misleading scientific and medical information through their publications and members to physicians and patients;

    d.    Funding continuing medical education to disseminate false and misleading information to doctors;

    e.    Paying specialists in the hormone and menopause fields to meet with prescribing doctors for the purpose of disseminating false and misleading information about the risks and benefits of the drugs;

    f.    Providing false and misleading information to the FDA to support inaccurate risk and benefit information contained in the product labeling;

10046

g.     Disseminating direct-to-consumer advertising that was false and misleading and/or concealed the true risks and benefits of these drugs.

118.   Through the materials they disseminated, Defendants falsely and deceptively misrepresented or omitted a number of material facts regarding their hormone replacement drugs, including, but not limited to, the following:

a.     The lack of and inadequacy of the testing of hormone therapy drugs, both pre-and post-marketing;

b.     The severity and frequency of adverse health effects caused by hormone therapy drugs;

c.     The range of injuries caused by hormone therapy drugs; and

d.     The lack of any reliable science to support representations about the benefits of hormone therapy drugs.

119.   These efforts resulted in a risk/benefit profile for hormone therapy that was accepted by the medical and scientific communities even though it was proved false by independent studies such as the WHI study.

120.   Defendants possessed evidence demonstrating hormone therapy products cause serious adverse side effects. Nevertheless, Defendants continued to market and represent such products by providing false and misleading information with regard to their safety and efficacy to Plaintiff's Decedent and Plaintiff's Decedent's treating physicians.

10046

121. Defendants engaged in all the acts and omissions described above with the intent that Plaintiff's Decedent's physician and Plaintiff's Decedent rely on the misrepresentation, deception and concealment in deciding to prescribe and/or ingest Defendants' products.

122. Plaintiff's Decedent and Plaintiff's Decedent's treating physician(s) justifiably relied to their detriment on Defendants' intentional and fraudulent misrepresentations as set out above. This reliance proximately caused the injuries as damages detailed herein.

123. Defendants' actions, described above, were performed willfully, intentionally, with malice and/or with reckless disregard for the rights of Plaintiff's Decedent and the public. At a minimum, Defendants' acts and omissions were (a) specifically intended to cause substantial injury to Plaintiff's Decedent and/or (b) when viewed objectively from the standpoint of Defendants at the time of their occurrence, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others. Defendants had actual and subjective awareness of the risk involved but nevertheless proceeded with conscious indifference to the rights, safety or welfare of others, including Plaintiff's Decedent. As such, Plaintiff is entitled to punitive damages against Defendants.

## DEMAND FOR JURY TRIAL

Plaintiff Mary Anne McCormick, Individually and as Personal Representative of Carolyn Jean Hartz, deceased, hereby demands a jury trial on all claims so triable in this action.

10046

Respectfully submitted,

Dated: June 27, 2008

s/ Daniel C. Hedlund
Daniel E. Gustafson (#202241)
Daniel C. Hedlund (#258337)
**Gustafson Gluek PLLC**
650 Northstar East
608 Second Avenue South
Minneapolis, MN 55402
(612) 333-8844 (Telephone)
(612) 339-6622 (Facsimile)


Gregory L. Laker (IN Atty No. 10322-49)
Elizabeth J. Doepken (IN Atty No. 23215-49)
**Cohen and Malad, LLP**
One Indiana Square, Suite 1400
Indianapolis, Indiana 46204
(317) 636-6481 (Telephone)
(317) 636-2593 (Facsimile)


***Attorneys for Plaintiff***

10046

39